2378-76, 2379-15, 2379-83, CRCM Institutional Master Fund v. Getty Images Holdings. Mr. Dvoretsky. Good morning, Your Honors. May it please the Court. Shai Dvoretsky for Appellant Cross-Appellee Getty Images. I want to start with a couple of points on liability and then focus on damages because there are significant issues with the District Court's damages analysis. Finally, time permitting, I'll address ALTA's two cross-appeal arguments on after-acquired warrants, one of which ALTA failed to raise below. Starting with liability, Getty Images didn't breach the warrant agreement. The agreement requires two conditions for warrant exercise. First, an effective registration statement for the issuance of warrant shares. And second, a current prospectus covering those shares. Neither condition was satisfied when CRCM and ALTA wanted to exercise their warrants, so Getty Images didn't breach the warrant agreement by not allowing warrant exercise. First, there was no effective registration statement in August 2022 because the registration for warrant issuance became effective only when the SEC declared the S-1 effective on September 15th. That's because Getty Images didn't and couldn't have registered the warrant shares for issuance on its Form S-4. To explain, Getty Images used the Form S-4 to register the warrants because it issued the warrants in its business combination. Did the S-4 in its face suggest that the warrants were registered? I don't think it did. The face of it refers to... Well, I mean, this right on page 1 is registering the new warrants to purchase common stock as well as the Class A common stock underlying the warrants, right? But this is where SEC guidance becomes important because under the CNDI... Isn't it true that on the face of it, it refers to the registration of the stock in question? It's registering only the offering of the warrant shares, not the issuance of... Does it say that? Does it say that it's only registering the offering of the shares? So I think that happens by operation of the SEC... Just say that. You're not answering my questions. Does it say it in the plain words? No, but that's how it has to be understood in light of the SEC guidance. And the SEC would have prohibited Getty Images from issuing the warrant shares without an effective registration statement. That's why, according to our expert in the record, more than 80% of similarly situated issuers did what Getty Images did in this situation as well, which is... But you know that the SEC wouldn't have allowed it, right? So we have the SEC guidance that says when warrants are exercisable within a year, which these were, an offering of the warrant is also coincides with an offering of the shares, and so you need to register the shares together. Then we have, you know, the SEC advice to life cycle, where they said that they couldn't register the shares underlying the warrant, and the SEC said, yes, you can, and so directed them to do so. So I don't know. Is it clear that you were not allowed to register the warrants on the S-4? So Judge Menasche... To register the warrants, the shares underlying the warrants. So Judge Menasche, over 80% of issuers did what Getty Images did here. If there's a question about whether 80% plus did the proper thing, it would be appropriate to ask the SEC for its views here. Okay, but so then even if it's ambiguous as to whether you were allowed to or not, still we also have a regulation that says if the SEC approves a registration, even if it's on the improper form, it's deemed to be effective. And so the SEC approved a document that purports to register the shares underlying the warrants. And so even if we thought it was ambiguous as to whether that was the right form, if the SEC didn't object and allowed the registration to become effective, did it become effective? Again, I don't think it did based on what the SEC guidance says. But watching the clock, I do want to make sure that I also get to the damages issue where I think there's at least a question for the jury. ALTA and CRCM have to prove first that they suffered damages and second that there's a stable foundation for estimating damages. Getty's images creates a genuine issue of material fact on both questions. Under basic contract law, the fundamental question for damages is how do you put the plaintiff in the position they would have been in but for the breach? And here the dispositive question is whether ALTA and CRCM would have been able to exercise their warrants and sell the resulting warrant shares for a profit if Getty images hadn't allegedly breached by preventing warrant exercise. We offered evidence showing that there would have been no damages. That's our expert testimony from Professor Fischel. The market price would have plummeted below the $1,150. Why would it have plummeted below the $1,150? So like there were 1.3 million shares sold short, right? And then it turned out there were only 500,000 available in the marketplace. So why would the introduction of an additional 50,000 shares have led the price to plummet? Like there still are conditions for the short squeeze and all of that if you add another 50,000 shares, right? So Judge Manasci, I'm not sure where you're getting 50,000. So how many shares would issue upon the exercise of the warrants? So there would potentially have been tens of millions. I believe it's 20 million additional shares that could have flooded the market if, in fact, these warrants... But you're talking about all the warrants, not just the warrants of these parties. I think even the warrants of these parties were several million shares that would have flooded the market. And so as a matter of basic economics, where you have 500,000 available shares, three times as many short sold, sold short, and then millions flooding the market, of course that price would have gone down, and that's what our expert report said. We also know, based on what actually happened in the market, when news came out that 99.4% of CCNB shareholders were choosing cash rather than Getty Images shares, that's what caused overnight the price of Getty stock to skyrocket from $10.50 to almost $27 a share. On September 15th, when the S-1 was declared effective and the market knew that more warrants were going to enter the market... Yeah. That's when the price went down below $10.50. So we know this is a market that is responding to information about Getty Images shares. Actually, so that makes me think of your argument about the prospectus, right? So that's your argument about why the low public float and the high redemption rate is material information that needed to be included on a prospectus, right? Right, going back to the liability question. Isn't that kind of a weird use of the prospectus requirement? Normally the prospectus is meant to protect the investor, but here you're saying it means we could deny the investor the right to the shares that they could exercise? Well, I actually do think that it's protecting investors, too, because what that 99.4% figure is telling people is that the CCNB shareholders almost unanimously didn't value the shares at the warrant exercise price, which suggested the possibility of this volatility and short squeeze in the market. Right, so I guess your argument would be if we had honored the warrants and issued the shares without disclosing that on a prospectus, and the warrant holders took a hit, they might sue us for fraud for issuing the shares while withholding material information. Is that right? Could they have done that? Is that the idea? I think that that's a possibility. I also think the SEC makes it the responsibility of management to decide. I'm curious about that. So, like, part of the purpose of the prospectus is to protect you from liability, right? So, like, did you have to make that disclosure before issuing the shares? Because otherwise maybe you could have been sued for withholding material information. I think yes, and I think that it is material information. At a minimum, it's a question for a jury whether it was material information for shareholders to know that or potential shareholders to know that 99.4% of the CCNB shareholders didn't think that the fundamentals of Getty stock at that time supported the warrant price, that they valued it below the warrant price. And so at a minimum, management's decision to treat that as material, if not fundamental, which is something that's within management discretion, is something that ought to be a jury question.  So even if it's not fundamental, if it's material, you think it's not commercially unreasonable to want to do an amendment to the prospectus.  Correct. Which is what the warrant agreement requires. And so that does take us back to the liability question. And, of course, the Court agrees with us on that. We don't even reach damages. On damages, though, at a minimum, we've created a genuine issue of material fact about whether there were any damages at all, and whether there – if there were damages, whether there is some stable foundation for – I'm sort of angry you want us to do about damages to, like, predict the dynamics of if the warrants had been exercised and there was more supply and so on. I mean, doesn't that make damages pretty complicated? I mean, why – we know what the demand was for the stock at that moment in time. Why doesn't it make sense to just say, you know, that is the way we would calculate damages? That was genuine demand for the stock at that time. You know, maybe the dynamics would have changed. Maybe there would have been a natural disaster that changed a whole lot of other things. But it's not really for the District Court to make that prediction. Well, I think it's for the jury to make that determination. To the extent it's complicated. Would the jury be speculating, I think, is the question. Given, you know, it's a clear – the market price was X. They were able to exercise that Y. It's pretty definite. And you're raising all these other possibilities as to what might have happened. Wouldn't that be asking the jury to speculate? I don't think the jury would be speculating, Judge Chin. I think the jury would be weighing competing expert reports. The plaintiffs have their expert reports, which acknowledge that the price would have gone down as a result of the exercise of warrants. They just dispute how much it would have gone down. We have our expert, Professor Fischel, whose expert report says that the price would have plummeted below $1,150. It would be for the jury to weigh those two competing models of what would have happened. Juries do that all the time. Okay. Thank you very much, Mr. Zborewski. You reserve time for rebuttals, so we'll hear from you again. But let's hear from the first appellee, Mr. Sher. Good morning. May it please the Court. Justin Sher on behalf of all the partners. I'm going to address the appeal. A couple points on the appeal. And then, if I have time, on my cross-appeal. And then I reserve about a minute for rebuttal. I'm going to go straight to the question of whether the prospectus was current. Putting aside what was in the prospectus or wasn't in the prospectus, there is no dispute that it was Getty's obligation to use commercially reasonable efforts to keep the prospectus current. And under the prevention doctrine, Getty's own failure to keep the prospectus current, Getty can't use that as a basis to avoid liability for failing to exercise. Now, to ‑‑ Well, they issued a new prospectus, what, August 9th, right? That's correct, Your Honor. They filed it. And that's shortly after, you know, what is it, like nine or ten days after the combination closed? I mean, why is that unreasonable? Well, for one thing, they could have done a prospectus supplement, also called a sticker. Well, they could have. I mean, I don't know. Isn't it really important information to know that there was such a high redemption rate and that there was such a low public float? It didn't seem like that was market‑moving information. Even if it were material, they could have simply slapped a cover page on it and rendered it current. But again, so the question I had earlier is, I mean, the prospectus is supposed to predict against liability, too. So, like, let's say they allowed the warrants to be exercised and they issued the shares. Couldn't the purchaser turn around and say, well, you know, you sold us these shares while having material information that you withheld, which is the high redemption rate and the low public float. Like, a reasonable investor would have wanted to know that. And if they took a hit, they could be liable, right? So wouldn't it be reasonable for them to want to do an amendment as opposed to a sticker? I think that's possible. But in order for them to have fulfilled their duty to exercise commercially reasonable efforts, as they acknowledge, they had to engage in some conscious exertion to accomplish the goal. And there is not a shred of evidence that anyone at Getty even thought about it. If the Court will indulge me, just want to read from Joint Appendix 2513 to 2514, which is the Getty CEO's testimony, who was also the corporate representative. Question. Between the close of the business combination and the filing of this Form S1 that we've just been looking at on August 9th, did Getty ever consider whether the Form S4 prospectus was no longer current? Answer. I couldn't answer that question. Question. Why can't you answer that question? Answer. Because I don't know if we ever considered whether it was not current. That — Getty cannot create an issue of fact in the absence of any evidence. Well, let me answer that. I mean, so if it turned — like, so I think if nobody noticed that the shares had never been registered and they sold them anyway, no one would say it matters whether somebody contemporaneously understood whether the registration requirement had been met. It only looked to whether it was met or not, right? So why isn't the same thing, the same kind of analysis apply to whether the prospectus was current? Like, there's no estoppel, right? It's just a matter of whether the conditions for the issuance were met or not. But because the Warren Agreement expressly requires Getty to have exercised commercially reasonable efforts to make the prospectus current, their decision not — their failure to do a sticker, perhaps if they had engaged in some thought and had done some conscious exertion as to whether the prospectus was current — So here's the trouble I'm having. So if, in fact, I think it is material information and it is commercially reasonable to do an amendment as opposed to a sticker because they want the protection from liability and it's not — it might plausibly be fundamental or it's really important or whatever. So I think that the behavior is consistent with commercially reasonable efforts. But nobody at Getty at the time appreciated that. Does that make it not commercially reasonable efforts? Why isn't it an objective standard as to what — about their conduct as opposed to what they subjectively believed they were doing? Because they could have rendered the prospectus current much faster and much more efficiently by doing a prospectus supplement. That's a different argument. You're saying that actually the premise would be wrong. Like, it is not commercially reasonable to want to do the full amendment, that they should have done a sticker under the circumstances. I think that's correct in your comment. Why is it objective inquiry and you think objectively their conduct was not commercially reasonable? I think that's correct, Your Honor. But I don't think they could — I don't think they can fail to engage in any process at all and then point to this failure to — They didn't fail to engage in a process. They did do an amendment, right? Right. But they didn't even think about it in the interim. And their position is not that they did the amendment to keep it current. Their claim is that they had to do it to register the status. All right. So your position is that it is material information, but it should have been stickered. It should not have been part of it. I don't think it is material, Your Honor. But I don't think — Well, isn't the high redemption rate and the low public float, that really changed the market, right? Well, in the S-IV, the S-IV expressly contemplated that. It gave — As a possible hypothetical scenario.   But, like, when it actually comes to pass, which you did not know it would at the time of the S-IV, I don't know, that seems like it's important information, doesn't it? I understand, Your Honor. I think there's an argument it is material, but they could simply have slapped a sticker on it. And they filed the AK announcing that to the market. Could you respond to the argument that damages was a question for the jury? Absolutely, Your Honor. Getty did not present a question of facts as to damages. What Getty does is they point to commentary from Jim Cramer on CNBC and, you know, rumors on social media to suggest that there was some kind of — there were rumors of a short squeeze, by the way. The expert doesn't even conclude that there was, in fact, a short squeeze. He only observes rumors of a short squeeze. And he posits that the price was, therefore, could have been inflated, and had ALTA turned around and sold its shares into the market, the price might have fallen. This was maybe a misunderstanding on my part. How many shares would have entered the market if CRCM and ALTA had been able to exercise their shares on the day that they tried to — their warrants on the day that they tried to? It's about 3 million, Your Honor. About 3 million. Yes.  So if we have market conditions where there were 1.5 million short sales and 500,000 in the market, and then that led the price to skyrocket, if you then introduce another 3 million shares into the market, I mean, what just — I mean, that's a pretty big increase in supply. I mean, isn't it just obvious that the price would have decreased? I don't think so, Your Honor. I will say — I think it's speculation. I will say two things about it as well. I think Getty's expert speculates that had this happened — first of all, ALTA could have held onto its shares. There was no obligation for it to turn around and resell it. So the fact that had Getty said yes on August 24th and given ALTA its shares, ALTA could have simply held onto it. There's no — and the measure of the — Well, whether they sell it or not, the market would know that there's an increased supply. I'm not sure that's true, Your Honor. I'm not sure that's true, because it's an interaction between ALTA and Getty. Well, you're not sure it's true. And the argument is that, therefore, a jury should have been allowed to decide it. I don't think so, Your Honor, and here's why. Because Getty's expert doesn't even have an alternative calculation for what the price would have been. All he does is speculate that it maybe would have fallen because of these rumors of a short squeeze. That's not enough to create an issue of fact. One more thing I will say. So if we know — let's say it were beyond dispute that the reason the price was so high was because of a short squeeze, would it then be correct that the introduction of these additional shares would have led to a drop in the price? I don't think so, Your Honor. It's hard to predict exactly what would have happened to the market. It's possible. I agree it's possible that that would have happened. But I also want to point out that even if the rumors were true and there was a short squeeze, all that means is some investors wanted to buy a stock to cover their short position. That's real demand for the stock, the asset that Alta would have gotten. It's no less real than demand for the stock based on rumors of a potential takeover or a belief that the product the company was selling was going to increase into the future. And the court is not required to look behind the market price in every instance. That's not really true because the condition for the short squeeze is the low public float in comparison to the short sales, right? And so the market would know that that condition no longer obtained. It wouldn't be a prediction about what would happen. It could be, Your Honor, but this is not a situation of fraud. There are people in the market who want to buy this thing. That's reflected in the price. The court should not be required to look behind what's driving the price and engage in some theoretical analysis of what the intrinsic value of the company is. If that were the case, the rule that you look to the New York Stock Exchange, which is one of the most efficient markets in the world, would never apply. You'd always have to look behind the price and engage in this analysis, and that can't be the rule. I see that I'm out of time. I'll reserve for my cross-appeal. Thank you very much, Mr. Sherry.  We'll hear from you again for a rebuttal, but let's turn to the other appellee, Mr. Sabat. Good morning, Your Honors. May it please the Court. Let me try to move directly to the matters that seem to be of most interest in the context of this morning's argument. On the issue of the currentness of the prospectus, have in view, Your Honors, that on July 28th, in an 8K, the matter of precisely how many shares had been exchanged or redeemed was disclosed to the market. Had Getty had any desire to maintain its S-4 Karen, it could have simply stickered the S-4 with the 8K, and the information that the Court has been discussing would have been attached to the registration as though originally filed. It takes care of every shred of fraud exposure. It gives the market that information. So they filed the 8K, right? The market responds to it. The SEC even asks for more information about it, right? So under those circumstances, why would it be unreasonable for them to say, oh, look, this is really important, we need to put this in a new – we need to amend the prospectus? Your Honor, we haven't seen any case law, and my friends haven't supplied any, that says if there is a material piece of information disclosed in an 8K and it is added to an incumbent disclosure as a pro sup, that that does not bring the incumbent disclosure into compliance and address any matter of fraud. Okay. So then I just have this question. So how would I know if I – like, let's say I agree with you that it could have been stickered. How does one conclude that it was commercially unreasonable to do an amendment as opposed to a sticker? Thank you, Your Honor. It's a core question because while we don't agree for the reasons set out in the district court's opinion that any of this is material given the information in the market, we think there's no question that the matter of – Oh, so actually, so before we get to that, I'm curious about that. So it's not material given the information in the market. So because they filed the 8K and then the information got out that way, it was no longer material for purposes of the prospectus? For the reasons – and, Your Honor, I want to fight your question. The 8K was part of the total mix of information. Even that, we think, given the – Yeah, so that's what you're saying, right? So, like, sometimes when we say the information is out in the marketplace, it's no longer material because the marketplace already is aware of it, and so it's part of the mix of information. That said, the 8K doesn't amend the prospectus. So even if it might not be fraud to sell shares in the absence of a current prospectus, it would mean the prospectus was not current when they sold it, and that would be a violation of the warrant agreement, right? So I don't know how to thread that. It does seem like, okay, maybe it wouldn't be fraud to keep selling until you amend the prospectus because the market had the information, but it does mean that if you know that there's material information out there that hasn't been in a prospectus, that you do need to make an amendment, and otherwise the prospectus is not current, right? The question is whether it's material, and the mere fact that it was on an 8K does not make it material, notwithstanding Getty's insistence to the contrary. That is a closer question than the question whether the commercially reasonable requirement of the contract mandated the sticker here. Okay, so let's – And I want to just – Because that, to us, given the record here, is an easy question. I say that, Your Honor, because irrespective whether we're dealing with an objective standard or a subjective standard, there has to be some effort. And the contract's pretty clear on this. Getty's obligation was to do everything reasonable to keep the registration current. That is a clear, strict, contractual obligation. The New York standards for it are clear. And putting a pro sup to incorporate an already filed 8K is something that even I could do, and I don't have a contractual obligation. It is the easiest thing in the world. And here's what they did, and Mr. Sherwood's bringing attention to this. They did exactly nothing to comply with the obligation to keep it current. They may have said to themselves, and I think I'm picking up, Your Honor, on the thread that you were spooling, and it's a fair one, well, maybe we'd like to do an amendment. That's fine. Do your amendment. In the meanwhile, you have a commercial reasonable obligation of effort, and they could have stickered it pending. If we have evidence in the record that actually Getty considered this question, there was a meeting, and they all talked amongst each other. They said, well, look, this 8K information is really important. The SEC's interested in it. It's market-moving information. It means our prospectus is stale. It's too important to put in a sticker. We need to do an amendment. If they had considered that squarely and decided to do it as an amendment, then you're saying that would be commercially reasonable? If there was record evidence that suggested a basis to conclude that it was commercially unreasonable to take a simple step to maintain the prospectus, Karen, then that argument would prevail. But there's nothing. Well, things that are commercially reasonable are a range of conduct, right? Like, you know, it could be that it's commercially reasonable to do a sticker, but it's also commercially reasonable to do an amendment. And there are reasons why you'd want to do an amendment rather than a sticker, because maybe the SEC's going to decide it's fundamental. Maybe it's going to be really material, and so you want to be protected against liability, right? So you're saying you're trying to sort of changing the standard by saying they have to show it would have been commercially unreasonable to do the sticker. But it's possible it's commercially reasonable to do the sticker or an amendment, right? Your Honor, I think I — with respect, I don't think I'm changing the standard. I think it's my friends on the other side who are, have in view that one can resort to a process even in respect of material information. Clear as day. The question, as Your Honor has indicated, is one of fundamentality. Is it fundamental? The things that are fundamental changes are things like a capital R restatement, an acquisition, the disposition of a major business line, really big things. There is no viable argument. None. That this amounted to a fundamental change. And without regard to whether they wanted to do an amendment or not, that means had they been interested at all in maintaining the warrant's register, they could have stickered it with the information and it would have remained — it would have remained current. And the efforts provision in the warrant agreement, have in mind, is there to protect warrant holders. It's not there to protect Getty. The warrant holders have a contractual interest for which they bargained and paid. To have that — Yeah, that's a good point. So the prospectus requirement is to protect the warrant holders. That's true. Although having a current prospectus also does protect the issuer from liability, right? It does, but — They could worry that, well, if we issue the shares in the absence of a current prospectus and the buyers take a loss, they could sue us for fraud, for withholding material information, right? They — in some counterfactual world, they may have had that anxiety. Whether they could have had it here — But why could they even be here? Let's say they issued the warrants, and then the warrant holder — sorry, they issued the shares. Then the warrant holders took a hit, and then they turn around and they say, well, if you had revealed the high redemption rate, I wouldn't have exercised it at that time, and you completed the sale without informing the market of material information. Why wouldn't that expose them to liability? It's a fair question, Your Honor, but two responses. One is that we don't need to truck — we don't need to traffic in wood halves here. This is a complete evidentiary record. This case is either disposed of on summary judgment or goes to a jury. There is no evidence that anything like that ever happened. None. There's no evidence — You're making the point about how the prospectus requirement is really to protect the purchasers, but I'm saying — but it does protect the purchasers, because if they sold the shares without updating the prospectus, the purchasers might not have had the material information and might have turned around and sued Getty, and so they could be reasonably worried about liability because the purchasers had a right to be updated. And so it is a sort of odd situation where here the prospectus requirement kind of works to Getty's benefit, but if they had just gone ahead and issued it in the absence of an update, then maybe it wouldn't have, and so that's why they did it. Or why a commercially reasonable issuer would have behaved as they did. Two things. The record does not support that surmise. Secondly, there's no basis here to conclude, to even think, that this could have been a fundamental change that would have been — that would have been not properly dealt with by a prospectus supplement, by a PROSA. I know I'm out of time. I wanted to be available. On the matter of damages, I just wanted to say this, because there have been a lot of good questions about damages. There is a very well-settled principle of New York law that says you look to markets, and there's a reason you look to markets. It's because they dispense with the need of — they dispense with the need for speculation. They dispense with the need to recourse to fine but paid-for litigation experts. The registration statement requirement isn't seriously defended. If these shares had been in the hands of my clients, CRCM and Alta, they would have been in their hands at a time when the stock was trading at $28 a share on the most efficient market in the world. And it is true that there was a low flow, but there was hundreds of thousands of shares trading on this market every single day throughout August, 1.5 million shares trading on average throughout this entire period. The claim that the market would have been radically altered by this is not supported by nonspeculative evidence. Remember, Your Honors — So why is it speculative? So if we know that there's 1.3 million short sales and then 500 shares available in the public float, and so it's well below the short sales, and the 3 million additional shares would take it above that number, why isn't that obvious that it would just change the conditions of the market? And it's not speculative. It just would have. The leading and first analyst covering this stock told the market before August 22nd, having read the Warren Agreement and understood what it said, that these shares are going to be in the market as of August 22nd. Did the market crash? Nope. The market didn't move. Look, I can't tell you, of course, what the market would have done had this happened. It's precisely to avoid the fact that we don't know that there's a rule of law in New York that says markets are the best way to go about these things, and if you breach a contract and you can't figure out what the damages are going to be, look to the market price. But the idea that you can look to this, what happened in September, as Getty says, Your Honors, that's not real. We're talking about 2.5 to 3 million shares of stock with the warrants and 90 million that came onto the market in September, and they're not remotely similar. But what you're saying actually is it's obvious that that effect would happen with a whole lot of shares. In a sense, that's true. You're saying that we can take account of the idea that the price will drop when a lot of shares are introduced to the market. You're just saying that the shares that the warrants would introduce to the market are not enough to make it non-speculative. Obviously, if your warrants introduced 90 million shares into the marketplace, you'd say, okay, fine, yes, the price would have dropped, but because it's only 3 million, you're saying that's speculative? We know what happened when there were 90 million shares in September, and there were the 90 million shares and there were some other variables. We actually know what happened because we were able to look at the market. We were able to observe the market. We don't know what would have happened in August. Why not? Because there was a breach of contract. Now, there is the wrongdoer rule that says when you don't know what would have happened because of a breach of contract, you need to come up with some actual evidence to prove your point. My friends haven't done so. But even beyond that, Your Honors, what we don't have here is convincing evidence that had the shares come onto the market, the price would have plummeted at all, still less below $1,150, which is the claim on the other side. In fact, there's evidence to the contrary because the Warren agreements, by their more or less plain terms, said these shares were going to become available a month after July 22nd, August 22nd, and the analysts were saying so. Now, the question then becomes, in this informational vacuum, what's the damages rule? And we have an answer to that. It's pure. It's plain as day. The Boyce decision of this court says it. Multiple New York cases say it. You look to the market price, and you look to the market price because whatever its flaws may be, that's the best indication of what value is. Moreover, the question is, what would they have had in their hands, my clients, had the contract not been breached? What they would have had was a security. That was trading for $28 and change on that day. And the law is clear with a very sound basis in both policy and economics that that's the value to which they're entitled. Okay. Thank you very much, Mr. Savage. Thank you, Your Honors.  We'll turn back to Mr. Jaboretsky on rebuttal. Thank you, Your Honor. Let me address first the prospectus and then damages. On the prospectus, the requirement of the Warren Agreement is that the prospectus itself must be current. And in addition to all the other issues that we've been discussing, a current prospectus protects and is also material to those who might want to trade in the warrant shares, in the warrant holder, the warrants themselves. It protects people who might trade the warrants because that's going to tell you, the information, the 99.4% figure is going to tell you, that the price of the underlying warrant shares would have plummeted, and that goes to the value of the warrants. Yeah, okay. It's material information, but, you know, Mr. Savage was just saying, but the 8K informed the market of that. The market responded to it. It was already out in the market. So if it's information that investors already have, why don't you just put a sticker on the prospectus and say, all right, you know, we incorporate the information we revealed in our 8K? So, first, the prospectus itself has to be current, not just the 8K. Right, but the sticker doesn't update the prospectus, right? The sticker can update the prospectus, but not if it's a fundamental change. And it was at least commercially reasonable to think, it is at least commercially reasonable to conclude that. But it's a fundamental change? I mean, this is one of the scenarios that were envisioned by the original prospectus, right? So the idea that it came to pass, I mean, maybe that's material, but, you know, couldn't you just say, all right, investing public, it came to pass? I think it's a fundamental change when we see that the price went from $27 below $11.50. It came to pass that 99.4%, almost all of the CCND shareholders, chose cash rather than Getty Images stock. That's a pretty remarkable outcome. Okay, I get if it's fundamental, you have to do an amendment. But let's say it's material and not fundamental. How do you evaluate what's commercially reasonable as to whether to do an amendment or to do a sticker? Look, I think in that situation, the company is not obligated to take on the risk of a potential securities violation. It is commercially reasonable to choose not to sticker it, but to treat this as fundamental in that situation. At a minimum, that's a— What protection would the amendment offer that the sticker would not? I'm sorry? What protection would the amendment offer that the sticker would not? It's more complete. The sticker has to be succinctly stated. The amendment— So does it not matter that the information was already public in the 8K? Doesn't that change things? I don't think it does for two reasons. One— I mean, is it still material if it's already public? Well, one— Is it a material omission if it is already public? I think it could be under the terms of the contract, which require the prospectus itself to be current, not just looking to what information is out in the marketplace. The other thing is that a joint appendix 2822 to 23, the SEC itself had follow-up questions asking Getty to update the prospectus, including with respect to information about how the addition of shares to the marketplace could affect the stock. With respect to the damages, if I could just briefly address the point about market price. While market price is often, even usually, the rule, that's not always the case. This Court's decision in Cottom, for example, shows that. That's because the fundamental question is, what would it take to put the plaintiff in the same position they would have been in, but for the breach? Here, we have a historical foundation that shows incredible volatility in Getty Images' stock. We know that after the warrants did become exercisable, the price quickly plummeted. And so the question for a jury here is, what would have happened in the counterfactual world, where investors would have known that millions more shares were coming? This is a case where the fundamental assumptions underlying the use of the market price don't hold. Our expert report at least creates a material question of fact about that, and that should have bothered the jury. Okay. Thank you very much. Mr. Dvoretsky, we'll turn back to Mr. Sher on rebuttal. Thank you, Your Honor. With respect to Alta's cross-appeal, the Court should have allowed Alta to recover for the warrants it purchased after August 24th. Alta believed that Getty was in breach of the warrant agreement, and based on that belief, Alta bought more. If Alta was right and Getty breached the warrant agreement, as the district court found, and as we hope this Court agrees, then Alta is entitled to some remedy. And we have two theories as to what that remedy should be. First, under the R.H. Mackey case, decided by Judge Kodal, Alta stepped into the shoes of the prior warrant holders, and a jury could have found that those prior warrant holders would have paid $11.50 to get something. There's nothing about what the prior holders wanted to do, whether they tried to exercise, whether they were rejected. There's certainly uncertainty there, Your Honor. I would submit it's very different from the speculation required to assume that some event would affect the price without having a calculation of the price. But we do have some evidence that would support a reasonable inference that prior holders would have paid $11.50 to get $30. First, they would act rationally. They bought the warrants for the very purpose of exercising them for a profit. Second, we have evidence that multiple warrant holders inquired about exercising their warrants. And third, we have evidence from a broker and an economics expert that any warrant holder that wanted to exercise... But while you're buying the security, allowing us to step in their shoes and have the breach of contract claim, the breach of contract claim is a separate asset, right? Like, even if they tried to exercise the warrants and they had a breach of contract claim against Getty, which we don't know that they did, but even if they did, they could have assigned that to one party and sold the warrant to another party, right? Like, why does the claim travel with the purchase of the security? It's because of UCC 8302, which says that when a purchaser acquires a security, they acquire all rights in that security. And that makes sense, especially for a warrant, because if the rule were otherwise, then anybody who touched the warrant on a given day could bring in their own breach of contract claim if it passed multiple hands on August 24th. They could all bring breach of contract claims if they wanted to exercise them, and Getty's liability would be exponentially higher. Since a warrant can only be exercised once, it makes sense for that breach of contract claim to travel with the warrant. But at a minimum, the Court should have granted judgment for ALTA consistent with its judgment as to CRCM and granted ALTA guarantee. Isn't there a difference? With respect to what? Well, they had tried to exercise their warrants. Does that not make a difference? I think the facts are actually even more favorable for ALTA. ALTA actually submitted a notice of exercise on August 24th. CRCM, previously, before the original breach, had inquired about whether Getty was going to honor the warrant agreement. So ALTA, after submitting a notice of exercise and being denied, thought that Getty was wrong and bought up more. And, of course, they had demonstrated their intent to exercise their warrants. They would have continued to exercise those warrants had they been able to, because they thought Getty was wrong. Now, they tried to get Getty to change their position. There was more communications. But it's identical to CRCM. The initial breach as to CRCM happened, I think, it was on August 22nd. And CRCM purchased additional warrants on August 23rd. I'm not a – I don't think there's any evidence there was additional communication on that day. But the Court inferred that they would have exercised or attempted to exercise those warrants on that day. Very, very similar, almost identical evidence. The judgment should have been consistent. Okay. Thank you very much, Mr. Sher. The case is submitted. Thank you, Your Honor.